New York, Texas, this is Sabine. Is the appellant ready to proceed? Yes, Your Honor. All right. You may. May it please the Court, Counsel. My name is Jason Byrd from Beaumont, Texas. I represent the plaintiff in the underlying case, the appellant in this matter, Melissa Tyson. Just as an initial aside, Ms. Tyson asked me to thank you all for at least allowing us to come here today, and I thank you myself professionally, as in 20 years this is my first trip to the Fifth Circuit, so thank you for allowing me to be here today. Well, if we'd known that, we'd have had a prize for you. Well, they already beat me up a little bit outside, so since I'm a newbie, y'all go with me. Well, I'm going to try and stay out of trouble, as my law partner said. Don't stay there for six months. Procedurally, this case stems from an incident that occurred in September of 2018 between my client and the defendant, Deputy David Boyd. Suit was filed under 42 U.S.C. section 1983 in the spring of 2019. Summary judgments were filed by the defendants the next year in August of 2020, and in July of 2021, approximately four weeks before trial, Judge Troncalli in the Eastern District Lufkin Division Providing granted the summary judgments on two bases, and the bases he granted the summary judgments on were on a lack of a constitutional claim presented under these facts for the 14th Amendment claim to the right of bodily integrity and for the Fourth Amendment claim on the seizure of the unnecessary force. I'll address those two issues today with you, but before we do so, I think it's important, particularly in this case, as I guess every plaintiff's counsel would argue in a 1983 case, is to really look at the facts and what got us here. The facts here are unusual, and even for me, to see these types of cases were somewhat more unusual than I typically would see. In September of 18, Ms. Tyson had been recently married to her husband, Wade Tyson. They were in West Texas and had some type of verbal dispute. They had a fight, a newlywed fight, unfortunately, and she decided she's going back home to their home in Sabine County, and she did. He made several calls to her that day, that night, the next day, and she was angry she wouldn't take his calls. Now, Sabine County is a small county of about 10,000 people on the border in Deep East Texas, and Mr. Tyson's lived there his whole life. He called down to the sheriff's office and said, look, Melissa and I had a fight. Will you all do a wellness check on her and check on her? They did, and by doing so, they initially made a phone call to her, and that phone call was made by Deputy Boyd to her, making that check. The phone call actually lasted over an hour, and he professed how he was not only a deputy but a pastor at a local small church. That's why he was the one who did these calls and wanted to check on her. She confirmed at the ultimate, at the end of the conversation. She was very comfortable with their discussion. She confirmed she was okay, but agreed that he could come out when he went in in the morning to check on her tomorrow so he could report back to Mr. Tyson. Deputy Boyd did show up, and he did come on what we believed, or at least Ms. Tyson believed, was a wellness check, but shortly after he arrived at the home, that pretense of a wellness check changed, and she went through what I would characterize as a two hours worth of terror, which culminated in a sexual assault. Was he in a private car? He was in a private car, Your Honor. He was not in uniform? He was in what she believed to be uniform. He approached in a private car, which she found strange and testifies to saying, but he had a black shirt emblazoned Sheriff on it and appeared to have all other gear. He had also told her the night before that— What about a weapon? The weapon, I don't want to misrepresent that to you. I don't remember. I don't know if he had the weapon or not. I believe he did. I know in the encounter he never brandished it, though, so I won't represent that. He did then approach, and they went to the back porch and had a discussion, and the discussion got very strange very fast, and it became very sexual, at which point she was concerned and not knowing what to do. She also noticed sitting there at the window right by the porch, she saw a marijuana pipe, and she admissed to that. She said, oh, I have that marijuana pipe sitting out, and then the discussion from Deputy Boyd turned on. Well, you know I pick up swingers, and they like smoking that marijuana, and I have to ticket them, and I have to sometimes arrest people. It made direct implication of what they both could openly see, which scared her more. She didn't want trouble. She has no criminal history and was concerned about her husband's application for a job overseas as an electrician. That would jeopardize her being able to go with him. Nevertheless, this encounter continued, and she tried to get away. She went inside under the feigned guise of I'm going to get some water. He followed her through the house. They end up back outside. At some point, his wife even calls, and he talks sexually inappropriately in a way I very inappropriately. Ultimately, this encounter ends where he commands her to get naked to expose herself, at which point then he exposes himself, and he doesn't. If there's a term that's traditional rape, I don't know there is. He doesn't traditionally rape her. He doesn't climb or put himself inside her, but he stands within inches of her face and masturbates and ejaculates on the porch. Then it ends, and he goes away. She reported this to the Rangers. The Rangers investigate. Ultimately, he was arrested. He was indicted, and we should note he was indicted for indecent exposure. He was indicted for official oppression, and he was indicted for sexual assault. He was indicted for rape by the state of Texas. Those charges are still pending to my knowledge. Did she tell the Texas Rangers anything about the marijuana, about being afraid that he saw the marijuana? I don't know if it flexed a report, but yes, she did. She's been open about—she's been open about—I was—that's why I was concerned about the marijuana. She told the Rangers that, and in fact, from my understanding, the defendant denied the encounter to the Rangers, and is why the record shows a DNA warrant, at which point the story then changed. Nonetheless, in the discovery of this case, we found out more. We found out there's been at least four previous complaints to the sheriff of sexual impropriety. Maybe not reaching quite this level, but four complaints of sexual impropriety by this same officer to the sheriff. Then we went back and found out that he's actually had a civil suit in the last number of years for the same types of things, and the civil suit was by some parishioners at a previous church that had sued him for sexual misconduct. We also found his previous employment at the Church of God resulted in his termination for the same thing, and his actual excommunication from that church, and so that's important just to know who we're talking about and what we're dealing with. This was a series of events that occurred for 20 years during his employment, whether it be with the church as a pastor, or whether it be at the sheriff's department that culminated in this last event with Ms. Tyson. What we have in the underlying case is this 1983 claim where we've got two questions, and we alluded to it earlier, a person acting under the color of law, and they deprived someone of a constitutional right, and our district court said, no, under these facts as a matter of law, we don't. The first one I'll address is the 14th Amendment claim, because I think really, at least in my novice appellate work, I think really in our circuit, in the Fifth Circuit, to some degree this is a case of first impression because of the facts here. We clearly, I think, can say if there's a traditional rape, there's those cases we see that that reaches to the level that can violate the 14th Amendment right to bodily integrity. But then we have the other cases that involve an overzealous officer, I think is what they talk about, that perhaps language, maybe some sexual harassment, some words, and maybe an inappropriate path that don't quite reach that level. And I think, at least in my simple view of it, with regard to the 14th Amendment, it is more like some bad words and an overzealous officer carrying out his duties of a wellness check. I think there's no confusion of what I would submit, that it's more akin to the former as opposed to the latter. Now— Well, the state grand jury saw it that way, too. Well, they did, and that was my first point. Actually, when I looked in my notes, my first point is, well, the state of Texas thinks so, too. And I think, too, at least if we allow to look at the totality of the circumstances—now, maybe a jury doesn't believe that he was in control of this situation. Maybe a jury doesn't believe that she had a reasonable fear because of the marijuana pipe. Maybe a jury doesn't believe all these things. But these are facts, because we have to look—this was at a summary judgment stage. These are facts showing that he was in control of the situation, and he had the authority in the situation, and he carried out what he wanted to do. I just don't think under these facts, which I'll note as well, are undisputed. And there's not a big dispute in this case of what the facts are. There's been no submission by defendants of an alternative view.  On the Fourth Amendment claim, a little different and, frankly, a little harder to analyze, because most of our Fourth Amendment claims, or at least the cases that I see and the court has likely seen, are these forced claims that involve weapons, that involved injuries in maybe a car door and putting someone in custody when we talk about these seizures, when, in fact, what we have here, the weapon is not a gun or a taser or a car door or handcuffing. The weapon is a sex act. And so what we have to do, at least I think, is note, number one, it's not physical force. He physically didn't hold her down, but I don't think the Fifth Circuit requires that. In fact, in our Carroll v. Ellington and Arnold v. Williams state that we don't have to have actual physical force to have an unnecessary use of force in a seizure. Also, I believe our standard is to look at a totality of the circumstances and determine whether or not Ms. Tyson reasonably felt she was free to leave. Which she never tried to do. She tried to go into the house. She tried to get away. And that's part of the problem here. And when you look at the cases cited by the district court, we're in rural East Texas. There's not a neighbor nearby. There's no one around. Where does she go? She didn't feel. Now, a jury may not believe that, but she didn't feel she had anywhere to go. Well, what's a little odd about the free to leave standard is she's in her house. Usually free to leave comes up when you're stopped on the street corner. Can I get back home? I mean, it's almost when police come into your house like he eventually did. That's usually viewed more as a search issue. But it's a little weird to say, was she free to leave him? She wanted to be at her house. She wanted him to leave, I'm guessing, is the issue. Right? Absolutely. And she can stay at her house. And that's the issue you see with the case law cited by Judge Trump calling his opinion. It talks about these airport seizure cases and a police chase. And those are all different. Those are public places. There's people around. You're not at your home. Where was she to go is kind of the question. Also, and I think his own authority in the situation points to where she had nowhere else to go. And he was there initially to conduct this alleged wellness check, but it morphed. And then lastly, you know, there's no doubt this type of situation, it should not be what happens at an encounter with citizens and the police. We know that. I don't think anybody would dispute that. And I think the terrible issue here is, I think there's facts. Now, there's facts that meet each of the elements in both of the claims. You didn't bring any state tort claims against him? She did not. Why not? These were the claims we chose to bring. She chose to bring. Part of it, too, has to do with practicality in an ultimate payment of potential judgments on those issues, to say it nicely. He's not indemnified on state torts? Yeah, well, the problem becomes he's not indemnified on any of it the minute he's convicted and or policed to anything that's intentional. And so as a result, you're chasing your tail on any other kind of tort claims, which which leads to. Absolutely. Ultimately, I reserved a few moments at the end. I appreciate your time. I'll get back the last 30 seconds at this time. Thank you. Good afternoon, Judge Graves. May it please the court. My name is David Iglesias, and I am the attorney for the appellee David Boyd. Are the criminal proceedings still pending? They are, Your Honor. Mr. Boyd has pleaded not guilty in those in those criminal proceedings, and he awaits his day in court. One of the reasons that the facts here are not contested is because he pleaded the fifth in his deposition. So the only body of facts that this court has are the facts that were provided by the appellant in this situation. Did you move to have this case stayed? Yes, Your Honor, we did. We moved at one point and it was granted twice. We asked for an extension twice. The problem was with COVID. Hold on just a moment. Looks like the clock's not running. Now it is. You got 60 seconds left, I believe. Thank you, Your Honor. All right. Just kidding. But the problem was with COVID. COVID intervened in this litigation and in the criminal prosecution, and it caused a significant delay in the criminal prosecution and in the litigation as well. Your Honor, Justice Oliver Wendell Holmes once said that hard cases make bad law. In this difficult case, the appellant is asking this court to make bad law. First, by asking this court to disregard the standard in U.S. v. Mendenhall, which requires that Fourth Amendment seizures be determined from an objective standpoint. What's bad law about saying it shocks the conscience for a law enforcement officer to sexually assault someone he's supposed to be going to the house to do a welfare check on? There's nothing— Bad law? There's nothing in the record right now, Your Honor, first of all, which would show that he was acting under color of law. But even if the court were to determine that he was—that Mr. Boyd was acting under color of law at this particular point, the appellant has— He was going there because the husband was worried about her. If not for the husband saying, go check on her, how would he—I mean, I know he saw her at, like, the Mexican restaurant the night before, but I thought it's pretty clear he was going—at least he claimed to be doing a check on her because of the husband, which he's only doing that because he's a law enforcement officer.  night before, Mr. Boyd called the appellant. They talked for about an hour, and then he came over the following day, not in a patrol car. And incidentally, on page 901 of the record, it shows that appellant never saw a weapon on Mr. Boyd. There is a question of fact that he was wearing a black t-shirt, and the appellant testified that it had the word sheriff on it, but it was not—it was not a uniform. Did he get paid that day for working? He was not on duty at this time, and his timesheet's actually in the record, Your Honor. So— Assuming he was acting under—and you can come back to that. I mean, I know that's an issue in this case. But on the substance, why is it bad law to say it shocks the conscience for a law enforcement officer supposedly doing a welfare check to help someone out to engage in what's been charged criminally as a sexual assault? First of all, in Collins v. the City of Harker Heights, the Supreme Court held that it's always been reluctant to expand the concept of substantive due process, and that's precisely here what the appellant's asking this court to do, is to significantly expand the concept of substantive due process. I would direct the court to— Well, not just we have the shocks the conscience standard. That's the standard, and you've got to always apply it to whatever facts come up in a case. Yes, Your Honor. And we're also here on an appeal from the granting of qualified immunity. And the standard in that case is that the plaintiff has to bring forth case law that would put a reasonable officer in Mr. Boyd's position on fair notice that his actions would violate the Constitution. And in this case, I believe the best example of this, both for the purposes of the Fourth and purposes of the Fourteenth Amendment, is a case called Gillot v. Castro, which was cited both in the district court and in this court. In that case, the United States District Court for the Eastern District of Louisiana here in New Orleans confronted a situation, and notably, this Gillot v. Castro was handed down 62 days, two months to the day, prior to the time that Mr. Boyd and the appellant met. So this was the state of the law at the time that this was actually going on. In Gillot, a sex worker here in New Orleans had been contacted by an undercover police officer, and they contracted for him to pay her for sex. When he went to her house, she opened the door wearing nothing but a towel, and she complained that the officer touched her bare breast without her permission, and she complained that later on, while she was being arrested, two arresting officers oboled her fully nude body while she was getting dressed in order to be taken to the police station to be booked in. In that case, the United States District Judge here in New Orleans specifically noted in his opinion that he had reviewed case law for the Fifth Circuit, for district courts in Texas, Louisiana, and Mississippi, and found no case law in any of those jurisdictions which would have made it clearly established either that this tactile, physical contact between an officer and an arrestee would have violated clearly established law. So two months later, we have a situation where the appellant is arguing that there was a non-tactile sexual encounter in which she was not arrested. She was not in custody. And so how much more in this situation when the law at that point was a United States District Judge in this circuit had found that it was not clearly established that far more intrusive behavior would violate the Fourth and Fourteenth Amendment than in this case Mr. Boyd is certainly entitled to qualified immunity based on the Fourth and Fourteenth Amendment. Additionally, Your Honors, the record is clear that the appellant was never seized for the purposes of the Fourth Amendment. U.S. versus Mendenhall specifically holds that the analysis of how to determine whether or not a person was seized is objective. Factors in Mendenhall include whether or not the officers were carrying a weapon, the presence of more than one officer, and whether or not the officer's tone or demeanor could imply to an objective person that their acquiescence to a request would be compelled. And in this particular case, we don't have any of that. The facts in the case show that Mr. Boyd came to the appellant's residence in his own car. Whatever he was wearing, it was not a uniform. At the very most, it was a t-shirt with the word sheriff on it. The appellant never saw a weapon and there's no evidence in the record which would show that his tone or his demeanor would have implied to a reasonable person in the appellant's position that her performance or her acquiescence would have been compelled. Additionally, Your Honors, in U.S. versus Brindlin, it goes a step further and it discusses a topic that you brought up when my colleague was arguing Judge Costa and that's that the objective standard is also applied whenever a person has no desire to leave for a reason unrelated to the presence of a law enforcement officer. So, for example, in a situation where a person is at their home, and in that case, the court is to consider all the facts and circumstances and determine whether a reasonable person in the complainant's position would have felt either that they were not free to decline the officer's request or they were not free to otherwise terminate the encounter. There's nothing in the record here which would show that the appellant was not free to decline the request or not free to otherwise terminate the encounter. On the contrary, the evidence here shows that, first of all, the appellant never attempted to deny any such request, never attempted to terminate the encounter. What do you make of her assertion that she feared that she may be arrested with regard to the marijuana, possession of marijuana? Your Honor, I don't believe that a reasonable person in the appellant's position would have had that same fear. The appellant is basically saying that she feared that Mr. Boyd saw marijuana that was inside of her house from his position outside of her house. There's no evidence in the record which would... She said there was a marijuana pipe. Yes, sir. There was a marijuana pipe, and I believe the record also says that there were actual...she had marijuana in there. She was a daily marijuana smoker. Nonetheless, the evidence in the record also shows that Mr. Boyd never mentioned the marijuana. The appellant never mentioned the marijuana to Mr. Boyd. Mr. Boyd never threatened to arrest her, threatened to detain her, threatened to... But he mentioned marijuana, didn't he? She said he mentioned marijuana, having to... Yes, Your Honor, the appellant said that Mr. Boyd had made some offhand remark about there being members of a swingers group in Hemphill that he would stop, he would confiscate their marijuana, and then he would send them on their way. A reasonable person... He said he would ticket them. Was she afraid of being ticketed? Well, and she may have said ticketed in the record. However, there's no evidence in the record which would show, first of all, that we get over that threshold of him ever actually having seen these drugs in her house. In fact, all the evidence shows that the only connection between the appellant's marijuana pipe and the appellant's marijuana and David Boyd was in the appellant's mind. There was never any point at which David Boyd, other than making this offhand remark... I thought it was in the window or something. I mean, isn't she entitled to all the inferences at this stage? She's entitled to all reasonable inferences in this stage, Your Honor, and it's not reasonable for her having... It's rank speculation that he saw this marijuana. She just simply says that... Why is it rank speculation? I mean, I thought he was facing it. I thought there was a little more to it than that. He was facing, you're in someone's house, you're looking at it, why couldn't a jury... They might take your view, but why couldn't a jury also say, sure, he probably did see it, especially in light of him starting to talk about marijuana, what prompted that. You add all that together, why isn't that a reasonable inference? She said that he was large and his body was tilted in a way that he was sort of going toward the window. And, Your Honor, based on all of the other facts and circumstances, the fact that it was never brought up, apart from this one random story about swingers, there's no other connective tissue between the marijuana and Mr. Boyd. Nonetheless, however, Your Honor, even if he did see the marijuana, even if he did see it, beyond that... You're calling it a random story about swingers. Given the rest of his conversation, the swingers part was right in keeping with the rest of the conversation. But it doesn't show that she was seized, Your Honor. Even if he is talking about swingers, it doesn't show that for the purposes of the Fourth Amendment, she was not free to leave, she was not free to deny his alleged requests, or that she was not free to... But if he's talking about swingers and then he mentions the marijuana, which she says was visible through the window, you maintain that there is no basis to draw any connection between his reference to having to ticket people for marijuana and what he may have seen looking through that window? We maintain that based on the record, it's not a reasonable connection. But even if that connection were reasonable, there's nothing that would show that she was detained. Your Honors, there are difficult facts in this case. However, the application of the law based on the current state of the law is not difficult. And Mr. Boyd would respectfully request that you find that he's entitled to qualified immunity. Thank you. Thank you, Counsel. You may proceed. Good afternoon. I'm Kelly Smith for the other defendants and appellees in this case, which is Sabine County and Sheriff Thomas Maddox. Ms. Tyson brought two claims against my clients. That's a Monell claim based on the alleged violations of the 4th and 14th Amendment and claims for failure to properly screen, train, and supervise Deputy Boyd. Obviously, if there was no constitutional violation, then those claims necessarily fail against my clients as well. And I will not regurgitate the arguments that have already been made by Mr. Iglesias unless the court has any additional questions on the 4th and 14th Amendment issues. Otherwise, I'll move ahead to the Monell argument, which Mr. Boyd did not address, but that is an additional ground upon which the court could have granted summary judgment. Summary judgment would be proper in this case for my clients. Ms. Tyson's claims fail on Monell because she cannot prove that there was any official custom or policy that was the moving force behind the alleged occurrence in question. To state a claim, she would have to show that there was an official policy or custom that the county had that was promulgated by the municipality and that was the moving force behind the alleged violation of our constitutional rights. In this case, this was an act by an employee who was off duty on his own personal time in his own personal vehicle, not in uniform, not wearing a weapon. This was not actually a wellness check. The wellness check occurred the evening before when he called the plaintiff on the phone and checked on her at that time. They agreed during that hour-long conversation that he would come visit her, but when he showed up to visit her the next morning at 10 a.m. when he was not on duty, that was not a wellness check. He was there for his own purposes. He was not there on behalf of the county. She even admitted in her deposition that she was surprised when he showed up in a uniform and he wasn't wearing a gun. She acknowledged that he was not there to perform an official wellness check as a sheriff's deputy. Were there other complaints against this policeman? Yes, your honor. There were, I think in the record, there were three or four prior complaints, but none that involved similar circumstances. They were all occurred during traffic stops and I believe that were just verbal complaints about language that he used or the conversation. Your honor, Sheriff Maddox did view the video footage from each of those stops and met with the complainants and determined that there was nothing to be disciplined, that there was no wrongful conduct, and that is in the record as well. One of them, he actually had the complainant come in. They watched the video together and she decided that there was, you know, no reason to press charges or no reason to make a Another one, he watched the video and then met with the father of the the girl that was stopped and again the father decided not to make a formal complaint. And then the, I think there were three circumstances that were discussed in Sheriff Maddox's deposition. There may have been four, but I believe that only three were covered in detail in the deposition. But Sheriff Maddox concluded after watching the video footage from the stops that there was nothing inappropriate and no reason to take any type of disciplinary action. And Sheriff was not aware of any of the any complaints other than those three or four incidents and none of them involved. Just so I'm clear on this process, so he calls in the complainant, the sheriff does, and then they watch the video together at the sheriff's office. Yes, your honor. And so then did he decide there was no basis to find that there was anything inappropriate that occurred or did they withdraw their complaint or did all this happen together? I guess what I'm saying is if they wanted to complain, it sounds like he's saying nothing happened. Yes, your honor. I believe in two of the instances the complainant came to the sheriff's office and either watched the video or met with him. And in both of those two circumstances, they didn't. They decided that there wasn't anything to complain about or there was no formal written complaint that proceeded beyond that point. All right. Well, my only concern again is I heard you saying the sheriff decided that there was nothing inappropriate that occurred and so there was no reason for any disciplinary action. I'm just trying to figure out if those were two separate decisions or people come in and they go, well, I just I'm going to drop this. The incidents were separate. Each of the three or four incidents were separate. And in each instance, the sheriff watched the video and discussed the issue with the complainant and then decided that nothing inappropriate happened. Yes, your honor. And I should note that none of those incidents were similar to this. They didn't involve him going to someone's house, requesting that they expose themselves, exposing himself or masturbating in front of him. I mean, these were just completely different types of incidences, nothing that would give rise to the type of concern that we're here about today. But were they about sexual language? I mean, I don't have a transcript of the video footage. I believe that there is no video footage anymore, that that was not preserved. I believe that that's an issue that's raised in the plaintiffs. What about the lawsuit case involving his church position? Your honor, that is a separate issue. I thought it was a failure to conduct a sufficient background, as the other sides are. Right. So they did conduct a background check. This is an officer who was TCOL certified. He had no prior arrest. He had nothing in his background that would have suggested that he was not fit for service in law enforcement. And the fact that he was excommunicated from his charge, even if that was known, that is not the type of issue that would preclude him from being a law enforcement officer. We hold preachers to a different moral standard. The fact that he may have engaged in extramarital relations and that he was excommunicated as a preacher has nothing to do with whether or not he was fit for duty as a law enforcement officer in this case. So you do know why he was excommunicated? It had to do with, I believe that they said, sexual inappropriateness or sexual misconduct at the church. But again, he's a preacher and he's held to a different standard in terms of what's expected. I mean, obviously he's a swinger, is what's in the record. And I would assume that that type of behavior is not acceptable to a charge, but it doesn't preclude him from being a law enforcement officer. And I guess what I'm saying is, and I don't want to nitpick this, but there's a difference between being a swinger and sexually harassing somebody. Yes, Your Honor. So you don't know which one was the reason that he was excommunicated from the church? No, Your Honor. All right. Was he fired immediately when you found out about this situation? I'm sorry, Your Honor? Was he fired immediately when you found out about this? I believe he was placed on administrative suspension, but I don't know that he was fired immediately. He has since been terminated, I believe, once he was indicted. There's just nothing in his record that would have precluded him from law enforcement service. He had no prior arrest. He was TCLA certified. They weren't aware of anything that would have led them to the conclusion that he should not have been hired. And additionally, he was supervised. As I mentioned previously, those four incidences that the county was aware of and that the sheriff was aware of were completely dissimilar, and they had no reason to believe that he would have gone on to commit the type of act that we're here about today. If anything, there's no causal connection between his hiring and his training and his supervision and the act that occurred. This is him acting independently as not as an employee of the county. All right. Thank you, counsel. Thank you. Rebuttal. Yes, Your Honor. Just briefly, I would encourage the court to really examine the record when we get to looking at the issues of what the sheriff did and did not do. There were several complaints, and they were not all traffic stop related. In fact, there were three affidavits attached to our original, not petition, our original claim in this case involving similar other complaints. We actually found one or two more, one of being a traffic stop. What the sheriff testified to in this case is that if there was not a formal written complaint, he would not take it seriously. He would not keep a record, and he would look at the video himself, but he would not maintain the video or keep any notes or look at any of this if it wasn't formally in writing, despite the mad people are showing up saying, you got a guy out here who's treated my wife inappropriately, my daughter or whatnot. And interesting, the record you'll see, one of the affidavits alleging, it was actually of a man alleging of an inappropriate encounter with his wife, which just parenthetically is Mr. Boyd's second cousin. So there's no bounds with this man. But I just want to make sure we were clear with that. Ultimately, you know, no one's going to say it, but the defense in this case, at least for a summary judgment standard at this point, has been to insinuate it's her fault. She didn't fight hard enough, so she could have been seized. She should have gone away. We can't have police officers in our three states who feel when they're going out to conduct these wellness checks that this type of behavior is appropriate. And I would ask that you remand this back to the district court for a full trial on the merits. I'm open for questions if you have them. Thank you, counsel. Thank you, your honors. Appreciate your time today. This concludes the matters on